UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Cement Masons, Plasterers and Shophands Service Corporation, | File No. 22-cv-712 (ECT/DLM) |
| Plaintiff, | |
| v. | **OPINION AND ORDER** |
| Quality Coatings, LLC; Quality Cleaning, Inc.; QC Companies; and Alisa Maciej, *individually*, | |
| Defendants. | |

Pamela Hodges Nissen and Amanda R. Cefalu, Reinhart Boerner Van Deuren s.c., Minneapolis, MN, for Plaintiff Cement Masons, Plasterers and Shophands Service Corporation.

Colleen Cosgrove McGarry, Katherine Marie Geneser, and Michael G. McNally, Fox Rothschild LLP, Minneapolis, MN, for Defendants Quality Coatings, LLC, Quality Cleaning, Inc., QC Companies, and Alisa Maciej.

In this ERISA case, Plaintiff Cement Masons, Plasterers and Shophands Service Corporation, the receiving and collection agency for labor-union fringe-benefit funds, seeks a judgment against Defendants for amounts due under collective-bargaining agreements ("CBAs"). Defendant Quality Coatings, LLC, is a signatory to the CBAs. Defendants QC Companies and Quality Cleaning, Inc. are not. Plaintiff's theory is that the non-signatories are alter egos of Quality Coatings, and that Quality Coatings has used the non-signatory entities to avoid its obligations under the CBAs. Plaintiff also seeks to impose personal liability on Defendant Alisa Maciej (pronounced "Match-ee").

Plaintiff and Defendants have filed summary-judgment motions. Plaintiff seeks summary judgment as to all claims against all Defendants. Defendants seek partial summary judgment on the subterfuge element of Plaintiff's alter-ego claim. The motions will be denied. On this briefing and record, the better answer is that genuine issues of material fact remain for trial, particularly regarding whether Defendants acted as alter egos with anti-union sentiment.

I

Plaintiff is a "non-profit entity, established to serve as the receiving agency and collection agency for member employee benefit plans for which it serves as a fiduciary and collection agent." ECF No. 72 ¶ 3. Plaintiff's members include the Minnesota Cement Masons Health and Welfare Fund, the Minnesota Cement Masons and Plasterers Pension Fund, the Minnesota Cement Masons-Plasterers-Shophands Local 633 Vacation Savings Fund, and the Minnesota Cement Masons-Plasterers-Shophands Journeyman and Apprentice Training Trust Fund (the "Funds"). ECF No. 72-2. The Funds are "multiemployer, jointly trusteed fringe benefits plans" administered in accordance with the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). ECF No. 72 ¶ 6. Each Fund has assigned to Plaintiff the rights and powers each Fund has under that Fund's agreements, declarations of trust, and any applicable collective-bargaining agreement to collect and receive employer contributions, collect and enforce the remedies the Funds may use to address employer delinquencies, and initiate legal action. *Id*. ¶ 11, ECF Nos. 72-7–72-11.

Defendant Quality Cleaning, Inc. was incorporated under Minnesota law in 1990. ECF No. 64-3 at 26; ECF No. 64-4 at 14. When formed, Quality Cleaning was owned by Timothy Maciej and his brother-in-law, Joseph Kapala. ECF No. 64-3 at 25; ECF No. 64-4 at 14–15. At the time of his deposition, Timothy Maciej owned fifty percent of Quality Cleaning; his brother, Gary Maciej, owned the other half. ECF No. 64-4 at 17. Timothy's wife, Defendant Alisa Maciej, is "very active in the management" of Quality Cleaning. ECF No. 64-3 at 53. Though Quality Cleaning started as a commercial cleaning company, it soon began performing floor coating work. ECF No. 64-3 at 22, 26, 29.

In 2004, Gary Maciej filed a certificate of assumed name with the Minnesota Secretary of State certifying that Quality Cleaning would be operating under the name "QC Companies."[1] ECF No. 77-3. In interrogatory responses, Defendants say that the name change to QC Companies was a "strategic marketing decision" after the company grew its floor coating business. ECF No. 64-6 at 6–7.

In 2008, QC Companies received a large contract for work at the Target Field stadium being built for the Minnesota Twins. ECF No. 64-1 at 12. QC Companies was unaware that union labor was needed when it bid on the project, only learning that union labor was required after it began work. Id. at 14–15. Mortenson, the general contractor

---

[1] The parties' briefs are imprecise in their references to Defendants. At times, for example, the parties refer to all Defendants together as "QC Companies." See ECF No. 84 at 5 & n.3 ("Throughout the remainder of this Memorandum, the reference to QC Companies includes both the corporate entity 'Quality Cleaning, Inc.' and the combined operations of Quality Cleaning, Inc. and Quality Coatings, LLC, known publicly as QC Companies."); ECF No. 103 at 1, 3. Especially considering the alter-ego theory on which Plaintiff relies, this practice was unhelpful.

for the project, told QC Companies to find a company that could provide union labor because Mortenson needed QC Companies' warranty for the moisture system.[2] *Id.* at 12–13. QC Companies did not sign a union agreement on the Target Field project because the company "had been a nonunion company for many years," which they did "to be competitive" in bidding on non-union projects against other non-union companies, and because they "had too much other work." *Id*. at 13–14. Instead, QC Companies subcontracted its employees through Commercial Shotblasting, a union company. ECF No. 64-3 at 32–36. Jim Knott of Commercial Shotblasting signed up between eight and ten QC Companies employees to the "Finishers" union, and Knott "made the payroll." *Id*. at 32–35. QC Companies paid for the employees' union enrollment, and Tim Maciej supervised and directed their work at Target Field. *Id*. at 33. After the Target Field project ended, those employees transitioned back to QC Companies' payroll. *Id*. at 34.

In 2011, QC Companies performed work on a Duluth, Minnesota-area job that also required union labor, and it again subcontracted work through Commercial Shotblasting. ECF No. 64-1 at 16. As with the Target Field project, Commercial Shotblasting submitted contributions to the Funds on behalf of QC Companies employees who worked on that project. ECF No. 61 at 3; ECF No. 64-7 (payroll statement).

---

[2]   What warranty QC Companies provided is not clear from the record. Alisa Maciej did not provide a detailed description of the warranty, other than that it was related to the "moisture system," and that QC Companies' employees were "needed . . . to complete the work in order to provide the warranty." ECF No. 64-1 at 12–13. Tim Maciej testified that QC Companies provided "20- to 30-year warranties" that other companies could not offer. ECF No. 64-3 at 132–33.

In March 2013, QC Companies bid on a project at the Roosevelt School in Minneapolis. ECF No. 64 at 26–28. The general contractor sought out QC Companies "because of the type of work it was and [because QC Companies was] the only one[] certified to be able to do the proper work." *Id*. at 28. The Roosevelt School project also required union labor, but QC Companies still was not a signatory to any agreement with the Union. Bob Ridge, a Local 633 business agent, negotiated a letter of assent that allowed QC Companies to perform the work and contribute to the Funds without becoming a signatory to the collective-bargaining agreement. ECF No. 64 at 26–27; ECF No. 64-8.

Defendants maintain that around this same time, Local 633 business manager Greg Massey came up with the idea to create a new company, owned by and set up in Alisa Maciej's name, that could be a CBA signatory. ECF No. 64 at 20–23, 30; ECF No. 63-3 at 4–5. In her deposition, Alisa Maciej testified that she and Tim Maciej met with Massey, who told them it was "easy to get a tax ID number, set up another office with a different address," and that QC Companies "would be able to continue as [they] were" but that "the union just wanted their portion of these larger jobs." ECF No. 64 at 21–23, 26, 30.

Plaintiff "adamantly denies" that Local 633 directed the Maciejs to form a second entity for union jobs. ECF No. 93 at 3 & n.2. In his deposition, Massey testified that union organizer Evaristo Ocampo (not Massey) met with Quality Cleaning employees "before they were a signatory." ECF No. 63-3 at 21. According to Massey, "a majority" of Quality Cleaning employees signed authorization cards to join the union, so he and Ocampo set up a meeting to "inform [QC Companies] that their employees had an interest in joining the

5

union." *Id*. at 21–23. Massey testified that he and the Maciejs had a "pretty low-key" meeting about signing a contract and organizing their employees. *Id*. at 25–26.

Tim and Alisa Maciej eventually met with attorneys and began to set up the new entity called Quality Coatings, with Alisa as its owner. ECF No. 64 at 32–35. Quality Coatings was organized as a limited liability company under Minnesota law in June 2013, but it did not operate for about a year because the Maciejs "were successful with QC Companies and unsure if [they] wanted to do a coatings company through the union as [] Massey had suggested." *Id*. at 35, 39.

In June or July of 2014, Alisa and Tim Maciej met with Massey and Terry Babcock, a "sales rep and good friend of [Massey's]." *Id*. at 39. Alisa testified that in this meeting, Massey reiterated that "they just wanted a part of what we were doing and to be able to grow with us" and, in turn, "we wouldn't have any issues with the union when we were specified on jobs." *Id*. The union asked Quality Coatings to sign a collective-bargaining agreement, and Alisa Maciej signed the two-page Independent Addendum[3] to the collective-bargaining agreement on June 30, 2014.[4] *Id*. at 39–40; ECF No. 87 ¶ 6; ECF

---

[3] Plaintiff cites to the "Independent Addendums signed by [Alisa] Maciej" as "*Id*. at Ex. 1, 3, 5." *See* ECF No. 84 at 40–41. The preceding full citation in Plaintiff's brief was to the "Benson Declaration," ECF No. 73, which did not include exhibits of any Independent Addendum, nor did it include an Exhibit 3 or Exhibit 5. It appears Plaintiff meant to cite to ECF Nos. 87-1, 87-3, and 87-5.

[4] The record is unclear as to whether Alisa Maciej received or signed a copy of the collective-bargaining agreement. In a declaration, Alisa Maciej testified that Quality Coatings "never received a copy of the CBA" related to the two-page Independent Addendum that she signed in June 2014. ECF No. 99 ¶ 6. In her deposition, Alisa Maciej testified that Massey and Babcock did not bring a copy of the CBA to their meeting, yet she then agreed that "at some point after," she "signed a collective bargaining agreement."

No. 87-1; ECF No. 99 ¶ 6. Alisa and Tim Maciej told Massey and Babcock "[t]hat we had set up, we were ready to move forward under the agreement of our cleaners and our current work needed to be how it as and that the union would get their piece of the pie . . . on the larger jobs going forward." ECF No. 64 at 40–41. At that point, Quality Coatings was "[r]eady to start performing some union jobs." *Id.* at 41.

Quality Coatings subsequently set up a "separate office" and asked its employees to join the union. ECF No. 64 at 42, 48. Alisa Maciej described the arrangement with Massey as "when we could provide a warranty that others couldn't, and these came into play on large jobs, the union would get their piece of the pie and QC would get the opportunity to work without being hassled" or questioned by the union. *Id.* at 43. Alisa testified that "[n]o one else was certified to provide the extended warranty" that QC Companies could provide, but the unions wanted "the fringes to go into their funds." *Id.* at 43–44.

Defendants maintain that once in operation, Quality Coatings bid on and performed work for contracts that required union labor, and QC Companies bid on and performed work for non-union jobs. ECF No. 64-5 at 72–73; ECF No. 64-4 at 122; ECF No. 61 at 5–6; ECF No. 64 at 224–25. The distinction was determined by the "project manual documents" for the bid requests. ECF No. 64-4 at 119–22. When customers issued contracts to the wrong (Defendant) company, Alisa Maciej would request that the contract be reissued to the correct company that would be performing the labor. *See* ECF No. 64 at

---

ECF No. 64 at 40–41. Alisa Maciej stated that she executed "additional Independent Addendums" in June 2014, and again in 2016 and 2019, "believing the agreement reached with Massey in 2014 was still in place." *See* ECF No. 99 ¶ 6.

64–77; ECF No. 64-1 at 189–90; ECF No. 64-4 at 88.  QC Companies acknowledges that it performed non-union work for the same contractors for which Quality Coatings performed union work, including RJM, Mortenson, J.E. Dunn, Kraus-Anderson, Morcon, and Knutson.  ECF No. 64 at 228–29.  Defendants maintain that the two businesses—QC Companies and Quality Coatings—were kept separate.  *See* ECF No. 64 at 118; ECF No. 64-1 at 91; ECF No. 64-4 at 88.

In November 2021, Local 633 sent a grievance letter to Defendants.  ECF No. 63-4.  The letter informed Defendants that "Quality Coatings . . . is violating the governing collective bargaining agreement . . . by, for example, failing to pay CBA-required wages, failing to pay CBA-required fringe benefit contributions, failing to comply with CBA-required Union security terms, failing to convey CBA-required Union dues, and failing to use the CBA-required hiring hall."  *Id*.  The letter also accused Quality Coatings of "disregarding its CBA obligations by double-breasting[5] and operating 'non-union' under the guise of a single employer, joint employer, joint venture, and/or alter-ego, Quality Cleaning, Inc."  *Id*.  Dave Schutta, the Local 633 business manager who signed the grievance letter, testified that the letter was a "cooperative effort" with the laborers.  ECF

---

[5]   "A double-breasted operation occurs when the same owner owns both a union and a non-union company.  The non-union company bids on jobs that do not require a union contractor, while the union company bids on union jobs.  Both companies can thus bid more competitively in their respective markets.  Double-breasted operations in the construction industry are not inherently illegal. . . ."  *Moore v. Advantage Off. Servs., Inc.*, No. 09-cv-2463 (SRN/JJK), 2011 WL 2193848, at *1, n.1 (D. Minn. June 6, 2011) (applying definition in ERISA context) (citing *C.E.K. Indus. Mech. Contractors, Inc., v. N.L.R.B.,* 921 F.2d 350, 352 n. 3 (1st Cir.1990)); *see also Pipe Fitters Health and Welfare Tr. v. Waldo*, 872 F.2d 815, 818–19 (8th Cir. 1989).

No. 63-2 at 36. No grievance hearing occurred because "it never got that far," and "then this other situation we are in right now developed, so [they] decided to put this on the back burner." *Id*. at 36–37.

Plaintiff filed this lawsuit on March 18, 2022. *See* ECF No. 1. After the lawsuit was filed, Quality Coatings terminated its assent to the collective-bargaining agreement, notified contractors that it would no longer provide union labor on its contracts, and shut down. ECF No. 64 at 198–200; ECF No. 78-14. Once Quality Coatings shut down, at least one non-union project that Quality Coatings had begun for Kraus-Anderson was switched over to QC Companies. *See* ECF No. 64-5 at 117–22.

Plaintiff's Amended Complaint includes four counts: (1) a claim seeking the imposition of alter-ego liability for QC Companies and Quality Cleaning, alleging that with Quality Coatings they "should be treated as a single employer under ERISA Section 515," 29 U.S.C. § 1145; (2) a right-to-audit claim against all Defendants under ERISA, 29 U.S.C. § 1145; (3) a claim seeking the imposition of individual liability against Alisa Maciej under the relevant CBAs; and (4) a claim for "any and all unpaid fringe benefit contributions found to be due and owing for the Audit Period," along with interest, liquidated damages, attorneys' fees, and other relief under ERISA, 29 U.S.C. §§ 1145, 1132. *See* ECF No. 20 ¶¶ 37–63. Though the introductory paragraph of the Amended Complaint says that this case is brought under ERISA "and the Labor Management Relations Act ("LMRA")[,]" ECF No. 20 at 1, no count references the LMRA, *see id*. ¶¶ 37–63.

During discovery in this case, a payroll compliance audit of Defendants' payroll was conducted for the period of January 1, 2016, through April 30, 2022. Plaintiff's auditor concluded that Defendants owe Plaintiff the following amounts:

|  | Quality Cleaning, Inc. payroll | Quality Coatings, LLC payroll | Combined Totals |
|---|---|---|---|
| Contributions | $6,230,016.63 | $88,030.98 | $6,318,047.61 |
| Interest | $2,704,325.05 | $17,009.42 | $2,721,334.47 |
| Liquidated Damages | $623,001.66 | $8,803.10 | $631,804.76 |
| Double Interest | $5,408,650.10 | $34,018.84 | $5,442,668.94 |

*See* ECF No. 84 at 27–28; ECF No. 73.

II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Courts take a slightly modified approach where, as here, there are cross-motions

for summary judgment. *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012). When considering Plaintiff's motion, the record must be viewed in the light most favorable to Defendants, and when considering the Defendants' motion, the record must be viewed in the light most favorable to Plaintiff. *See id.*

Plaintiff asserts its claim under ERISA, specifically 29 U.S.C. § 1145. This section provides: "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement." Section 1145, together with ERISA's civil enforcement provision, 29 U.S.C. § 1132(a), "create a cause of action by which appropriate plaintiffs may enforce an employer's obligations to make contributions to employee benefit plans." *Romney v. Lin*, 94 F.3d 74, 82 (2d Cir. 1996); *see Trs. of the So Cal IBEW-NECA Pension Plan v. Fadul*, No. SACV 18-00605NS (DFMx), 2022 WL 2288022, at *5 (C.D. Cal. Mar. 9, 2022).

"The alter ego doctrine may apply when a pension fund tries to collect unpaid contributions." *Johnson v. Charps Welding & Fabricating, Inc.*, 950 F.3d 510, 520 (8th Cir. 2020) (citing *Greater Kan. City Laborers Pension Fund v. Superior Gen. Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997)). The Eighth Circuit applies "corporate law principles to determine employer liability under ERISA, where such principles comport with the language and purposes of the statute." *Superior Gen. Contractors, Inc.*, 104 F.3d at 1055. Under "the alter ego doctrine as developed under corporate law[,] . . . the legal fiction of the separate corporate entity may be rejected in the case of a corporation that

11

(1) is controlled by another to the extent that it has independent existence in form only and (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud." *Id.*; *see also Johnson*, 950 F.3d at 520. Plaintiff bears the burden of proving that Defendants were alter egos of each other. *Marshall v. Anderson Excavating & Wrecking Co.*, 901 F.3d 936, 943 (8th Cir. 2018).

No Eighth Circuit case has been cited or identified listing particular factors that must be considered to analyze whether, under the alter-ego test's first element, one organization is controlled by another. Regardless, it seems appropriate to consider any number of common-sense factors, including whether the entities share a business purpose, whether they share management and control, whether funds have been commingled, whether the entities share employees, whether the entities transact with each other at arm's length, and so on. *See Superior Gen. Contractors, Inc.*, 104 F.3d at 1055–56; *Shopman's Loc. Union 502 Pension Fund v. Samuel Grossi & Sons, Inc.*, 578 F. Supp. 3d 698, 707–10 (E.D. Pa. Jan. 6, 2022); *Trs. of Loc. 7 Tile Indus. Welfare Fund v. Sesso Tile & Stone Contractors, Inc.*, No. 15 CV 6124 (SJ) (RML), 2016 WL 4597481, at *2–3 (E.D.N.Y. Aug. 18, 2016); *Operating Eng'rs Loc. No. 101 Pension Fund v. K.C. Excavating & Grading, Inc.*, No. 01-0087-CV-W-SOW, 2002 WL 1492103, at *5–7 (W.D. Mo. Mar. 11, 2002).

Here, Plaintiff has not met its burden to show that, as a matter of law, each of the Defendant entities exists independently in form only. The fundamental problem is the absence of briefing fairly applying the appropriate legal framework to this case's facts. *See* ECF No. 84 at 30–35. Regardless, viewing the evidence in the light most favorable to Defendants, genuine fact questions exist as to whether QC Companies and Quality

Coatings existed independently in form only. Much of the evidence Plaintiff cites is disputed by competing evidence that Defendants kept the entities separate. Where the parties agree on the facts, the parties differ as to the interpretation or inference to be drawn from the record evidence, sometimes raising credibility questions.

Plaintiff argues that the Defendant entities' shared business purpose supports a finding that the companies were alter egos, pointing to the Maciejs having formed Quality Coatings to perform "floor coating work" for union contracts, "the operations" having a single website, and that the "work performed by both entities, all under the name QC Companies, was so similar that contracts . . . would be switched by merely changing the name on the contract." ECF No. 84 at 30–31. Though there is no dispute that the Defendant entities perform the same type of "specialty floor coating" work, ECF No. 84 at 30, ECF No. 103 at 16, whether the union and non-union work was kept separate is a genuinely disputed issue of material fact. Plaintiff asserts that Quality Coatings was formed to satisfy contractual warranty requirements on projects that required union labor, ECF No. 84 at 30–31, and Defendants say that this is exactly the point—QC Companies provided these services on non-union projects, and Quality Companies performed the same kind of work on union projects, just as (Defendants allege) Massey advised them to proceed. ECF No. 103 at 4–5, 16–17. Defendants point to evidence supporting a separation of the union and non-union functions, despite the companies' shared business purpose. For instance, Joseph Maciej, a QC Companies employee, described how he or Gary Maciej would decide whether QC Companies or Quality Coatings would submit a bid on a project, depending on whether the project was non-union or union. ECF No. 64-

13

5 at 72–73. If a project required union labor, Quality Coatings would bid. *Id*.; *see also* ECF No. 64-4 at 122. And though "all Quality Coatings' employees were previously QC Companies' employees," Defendants maintain that Quality Coatings performed work on contracts obtained by Quality Coatings that required union labor, and QC Companies performed work on contracts obtained by QC Companies that did not require union labor. ECF No. 61 at 6; ECF No. 64 at 224–25. Alisa Maciej testified that the "books were kept separate" between QC Companies and Quality Coatings. ECF No. 64-1 at 190. Alisa Maciej is unaware of a time between 2016 and 2020 where checks made payable to Quality Coatings were deposited in QC Companies' financial accounts; she testified that "if a check came that was due to Coatings and it was made to QC Companies, [she] would deposit it and immediately transfer it over" to the right company because "mix[ing] payments . . . would be a nightmare." ECF No. 64 at 118. Alisa Maciej also testified that Quality Coatings employees were paid through Coatings for all Coatings jobs. *See* ECF No. 64 at 178–82, 183 (Q: "Did employees ever work on Coatings' jobs and get paid through QC Companies?" A: "No, not to the best of my knowledge. I did my due diligence to make sure Coatings was Coatings and QC Companies was QC Companies.").

Plaintiff asserts that QC Companies' and Quality Coatings' shared management and control shows that Defendants existed independently in form only. ECF No. 84 at 32–33. There is no dispute that members of the Maciej family owned and operated both QC Companies and Quality Coatings. Plaintiff cites several facts it says establish shared management and control. These include: (1) the lack of independent infrastructure; (2) bids submitted in the same format; (3) combined bid logs; (4) project files kept in the same

14

format; and (5) the same cost structure for bids. *See* ECF No. 84 at 32–33. Though this evidence may lead to an inference that QC Companies and Quality Coatings were alter egos, it does not weigh indisputably in favor of a finding that the Defendant entities were independent in form only.

Plaintiff argues that the Quality Coatings and QC Companies existed independently in form only, as evidenced by their commingled funds and assets. Plaintiff asserts that the funds were commingled, pointing (without citation) to $11 million in income generated by Quality Coatings and $6 million of cash transfers made between Quality Coatings and QC Companies "during every month of the audit period" between 2016 and 2022. *See* ECF No. 84 at 33. Plaintiff also asserts that invoices for Quality Coatings projects did not "explain why more than $6 million in cash was transferred" between the companies. *Id*. Plaintiff goes on to discuss the two companies' mark-ups, deposits, and advances made between the two companies as evidence of commingling. *Id*. at 33–34. Though this evidence might ultimately justify the inference that funds were commingled, it is insufficient to establish that as a matter of law that the two companies existed independently in form only.

Plaintiff argues that Quality Coatings' and QC Companies' shared employees and payroll system demonstrate that the two companies were alter egos. *See* ECF No. 84 at 34–85. It is undisputed that the Defendant entities shared some employees, ECF No. 103 at 8–9, 19, though QC Companies had approximately 80 cleaning employees that did not overlap, ECF No. 99 ¶ 11. Alisa Maciej testified that the union was aware that employees would be shared between QC Companies and Quality Coatings because this arrangement

15

was discussed with Massey. ECF No. 64-3 at 132–34; ECF No. 64 at 188. She further testified that she would review timecards and split time between Quality Coatings and QC Companies. ECF No. 64 at 178. Plaintiff argues that "the documentation flatly contradicts" Alisa Maciej's testimony regarding the payment of overtime or "shop time," but Plaintiff does not cite evidence to substantiate this position. *See* ECF No. 84 at 35; *see also Johnson*, 950 F.3d at 524.

Plaintiff points to Quality Coatings' and QC Companies' shared vendors to support a finding that the entities were alter egos, but again offers no legal basis to demonstrate that the overlap of vendors is sufficient to support an alter-ego relationship. ECF No. 84 at 35. And some fact disputes exist regarding this factor. For instance, Plaintiff asserts that Quality Companies did not carry the requisite liability insurance for its space, ECF No. 84 at 35, but Alisa Maciej testified that insurance was "included in the markup" for QC Companies, and then billed to Quality Coatings on approximately a quarterly basis. ECF No. 64 at 97. Whether QC Companies and Quality Coatings existed independently in form only is a trial-worthy question.

Regarding the second prong of alter-ego liability, "[i]n the context of a collective bargaining agreement, a 'critical part' of the inquiry is whether an employer displays anti-union sentiment by using the alter ego to avoid its obligations." *Johnson*, 950 F.3d at 520 (citation omitted). Here, the parties differ on the inferences to be drawn from the record evidence, and the record does not contain evidence establishing beyond any reasonable dispute that the second prong of the alter-ego test is met. Plaintiff primarily argues that the Defendants displayed anti-union sentiment by routing union work through

Commercial Shotblasting before Quality Coatings was formed, by forming Quality Coatings to bid on union projects, by stating that QC Companies "could not be competitive" as a union company, and by bidding jobs through QC Companies to avoid paying fringe benefits to the Funds. *See* ECF No. 84 at 27; ECF No. 93 at 2, 4. It is difficult to understand how routing union work to a union company (and non-union work to a non-union company) demonstrates anti-union sentiment, much more establishes the presence of this element beyond dispute.

Where, as here, parties "disagree about how the facts of this case impact the outcome of the corporate law alter ego test," summary judgment on an alter-ego claim should be denied. *See Siepel v. John Heinlein Const., Inc.*, No. 7-cv-4643 (DWF/JJK), 2009 WL 1405223, at *5 (D. Minn. May 18, 2009). In light of that determination, the issues of damages and Alisa Maciej's potential personal liability will not be reached.[6]

---

[6] Defendants maintain that Plaintiff's audit findings are incorrect. According to Defendants, the findings represent hours performed "outside Plaintiff's jurisdiction" or "shop work" hours that were not "covered work," and do "not align with the payroll statements produced in discovery." ECF No. 103 at 13–15. It is questionable whether the materials Defendants cite to support these assertions really do. For example, Alisa Maciej described "shop work" spent at the "QC company shop" that, Defendants say, was not covered by the CBA. ECF No. 64 at 109–110. To support this assertion, Defendants cite testimony of Local 633's business manager. *See* ECF No. 103 at 15 ("Local 633's current Business Manager, Dave Schutta, testified that such work is not covered by the CBA. (Dkt. 64-7 at 50:5–7.)"). But ECF No. 64-7 is a series of payroll charts for Commercial Shotblasting Services; it does not address Dave Schutta's testimony about "shop work." *See* ECF No. 64-7. On another occasion, Defendants cite 219 pages of deposition transcripts to support a fact assertion. ECF Nos. 64-3, 64-4, 64-5 ["McGarry Decl. Exs. 4, 5, 6"] (totaling 219 pages of deposition transcripts that are not referenced by page number in the brief).

**ORDER**

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1. Plaintiff Cement Masons, Plasterers and Shophands Service Corporation's Motion for Summary Judgment [ECF No. 67] is **DENIED**;

2. Defendants Alisa Maciej, QC Companies, Quality Cleaning, Inc., and Quality Coatings, LLC's Motion for Partial Summary Judgment [ECF No. 59] is **DENIED.**

Dated:  December 6, 2023                                    s/ Eric C. Tostrud
                                                                              Eric C. Tostrud
                                                                              United States District Court