# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Cement Masons, Plasterers and Shophands Service Corp.,

       Plaintiff,

v.

Quality Coatings, LLC; Quality Cleaning, Inc.; QC Companies; and Alisa Maciej, *in her individual capacity*,

       Defendants.

File No. 22-CV-00712 (JMB/DLM)

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR PARTIAL JUDGMENT**

Pamela Hodges Nissen and Amanda R. Cefalu, Reinhart Boerner Van Deuren S.C., Minneapolis, MN, for Plaintiff Cement Masons, Plasterers and Shophands Service Corp.

Colleen McGarry and Katherine Marie Geneser, Fox Rothschild LLP, Minneapolis, MN, for Defendants Quality Coatings, LLC, Quality Cleaning, Inc., QC Companies, and Alisa Maciej.

This matter came before the Court for a bench trial to determine whether Defendants Quality Coatings, LLC, Quality Cleaning, Inc., QC Companies, and Alisa Maciej (together, the Defendants) are liable as a single employer for unpaid fringe-benefit contributions to Plaintiff Cement Masons, Plasterers and Shophands Service Corp. (Service Corporation) under the Employment Retirement Income Security Act of 1974 (ERISA), specifically under 29 U.S.C. §§ 1132(a), 1145. (Doc. Nos. 182, 183, 184, 187, 188, 189, 190, 191.) Based on the findings of fact and conclusions of law set forth below, the Court enters partial judgment in favor of the Service Corporation on the issues of Defendants' status as a single employer under the Service Corporation's alter-ego theory (Count I of the Amended

Complaint), the Service Corporation's entitlement to an audit of the Defendant entities under 29 U.S.C. §§ 1132(a), 1145 (Count II) for the audit period of June 1, 2016–April 30, 2022 (Audit Period), and on Alisa Maciej's personal liability for any amounts later determined to be owing to the Service Corporation (Count III).

## FINDINGS OF FACT

### A.   The Parties and the Local 633

1.   Cement Masons, Plasterers and Shophands Local 633 (Local 633) is a labor union that represents workers who perform cement-finishing work.   (Trial Transcript [hereinafter, "Tr."] 709:11–16; *see also, e.g.*, P-17.[1])

2.   The Local 633 negotiates collective bargaining agreements (CBAs) with employers and employer associations for the terms and conditions of cement mason employees' working conditions (including their wages and benefits), including, as relevant here, the Metro Area Builders Agreement Between Independent Cement Mason Contractors and Minneapolis and St. Paul Builders Division of Associated General Contractors of Minnesota and Minnesota Concrete and Masonry Construction Association and Cement Masons, Plasterers, and Shophands Local No. 633 of Minnesota, North Dakota, and NW Wisconsin (Local 633 CBA).   (Tr. 1090:13–1091:1; P-13; P-15, P-17.)

3.   The Local 633's daily office operations are overseen by a Business Manager. (*E.g.*, Tr. 887:9–12.)   Business Managers also negotiate CBAs with employers.   (Tr. 887:13–23; *see also* P-13; P-15, P-17.)

---

[1] The prefix "P-" refers to Plaintiff's exhibits.   (*See, e.g.*, Doc. No. 179.)

4.    The Local 633's Business Manager between 2005 and 2017 was Greg Massey.  (Tr. 886:14–15, 887:1–8, 898:19–899:1.)

5.    Upon Massey's retirement in 2017, and until sometime in 2023, the Local 633's Business Manager was David Schutta.  (Tr. 898:25–899:15, 916:24–917:1.)

6.    The Local 633 also has Business Agents, whose duties are to liaise between Local 633 cardholders and their employers for the purpose of ensuring employer compliance with their obligations under any applicable CBAs.  (Tr. 709:22–710:2.)

7.    As part of their duties, Business Managers meet from time to time with non-union employers when those non-union employers are awarded projects that require union labor (i.e., a Project Labor Agreement (PLA) project), and they may enter into letters of assent with such employers on behalf of the Local 633.  (Tr. 890:9–20, 913:1–20.)  Once a non-union employer performs work on a PLA project, they are bound by all terms of the any applicable CBAs (including the terms related to wages and benefits).  (Tr. 912:17–22.)

8.    Aside from CBAs and letters of assent, Business Managers generally do not have authority to make separate agreements between the union and employers.  (Tr. 1092:23–1093:3; P-15 at Art. 8.)

9.    Business Agents are not authorized by the Local 633 to give business advice to employers.  (Tr. 712:18–24.)

10.   The Service Corporation is a non-profit entity that was established to serve as the receiving agency, fiduciary, and collection agent for the Minnesota Cement Masons Health and Welfare Fund, the Minnesota Cement Masons and Plasterers Pension Fund, the Minnesota Cement Masons-Plasterers-Shophands Local 633 Savings Trust Fund, and the

Minnesota Cement Masons-Plasterers-Shophands Journeyman and Apprentice Training Fund (together, the Funds). (Doc. No. 180 [hereinafter, "Pretrial Stip."] ¶ 1.)

11. The Minnesota Cement Masons Health and Welfare Fund was established pursuant to a Restated Agreement and Declaration of Trust effective January 1, 2005, to provide health and welfare benefits for employees performing work covered by Local 633 CBAs. (*Id.* ¶ 2.)

12. The Minnesota Cement Masons Pension Fund was established pursuant to a Declaration of Trust, as restated January 1, 2005, for the purpose of providing retirement and related benefits for employees performing work covered by Local 633 CBAs. (*Id.* ¶ 3.)

13. The Cement Masons Plasterers Shophands Local 633 Savings Trust Fund was established pursuant to a Declaration of Trust, effective August 9, 1994, for the purpose of providing vacation and welfare benefits to employees performing work covered by Local 633 CBAs. (*Id.* ¶ 4.)

14. The Cement Masons Plasterers Shophands Journeyman and Apprentice Training Trust Fund Apprenticeship Fund was established pursuant to an Agreement and Declaration of Trust, effective October 1, 2006, for the purpose of providing educational and training benefits for employees covered by Local 633 CBAs. (*Id.* ¶ 5.)

15. The Funds assigned the following to the Service Corporation: (i) all rights each individual Fund has to receive remittance reports and fringe-benefit contribution payments for the contributions owed to that Fund pursuant to the Declarations of Trust and any applicable CBA(s); (ii) the right to enforce the Funds' rights and obligations with respect to reporting and auditing obligations relating to employer contributions; and

(iii) the right and responsibilities to pursue legal action for the collection of and the enforcement of any employer's reporting and payment obligations under the Declarations of Trust and the applicable CBA(s).  (*Id.* ¶ 6.)

16.    The Service Corporation acts as a fiduciary in its capacity as the receiving agent for employer contributions owed to the Funds and payable to the Service Corporation and with respect to collection and auditing of employer contributions.  (*Id.* ¶ 7.)

17.    Defendant Quality Cleaning, Inc. (Cleaning) is a Minnesota business corporation that is currently jointly owned in equal parts by brothers Tim Maciej and Gary Maciej.  (*Id.* ¶ 9; Tr. 36:22–25, 491:3–4.)

18.    Cleaning was incorporated in February 1990.  (Pretrial Stip. ¶ 9; Tr. 485:2–7.)  Defendant QC Companies is the assumed name for Cleaning (QC Companies, together with Cleaning, QC), and was registered as such with the Minnesota Secretary of State in 2004.  (Pretrial Stip. ¶ 10; D-80;[2] Tr. 490:21–23.)

19.    Tim Maciej's spouse, Alisa Maciej, formed Defendant Quality Coatings, LLC (Coatings), a Minnesota limited liability corporation, in June 2013.  (*E.g.*, P-27 at COATINGS_011439; Tr. 38:18–20.)

**B.    QC Companies and the Maciejs**

20.    QC performs cleaning services, including general office cleaning and specialized commercial cleaning for medical facilities.  (Tr. 37:1–8.)

21.    QC also provides polished concrete and resinous floor-coating services in the

---

[2] The prefix "D-" refers to Defendants' exhibits.  (*See, e.g.*, Doc. No. 179.)

commercial construction industry.  (Tr. 37:9–12.)  Cleaning markets these services in the commercial construction industry under the assumed name "QC Companies."  (Tr. 37:13–20.)

22.   Some of QC's employees do not perform QC's floor-coating work and instead perform only its cleaning services.  (Tr. 638:21–25.)

23.   Gary Maciej worked up project bids for QC's floor-coating work.  (Tr. 54:7–14, 1049:17–1050:1.)

24.   Alisa Maciej is a salaried management-level employee of QC.  (Tr. 36:20–21, 546:14–15.)   She has done the bookkeeping for QC since approximately 2004, including its payroll.  (Tr. 36:4–10, 36:17–19, 69:9–11.)

25.   Tim Maciej's and Alisa Maciej's son, Alex Maciej, is a QC employee.  (Tr. 145:8–11.)

26.   Gary Maciej's son, Joe Maciej, is a QC employee who performed sales duties, including working up project bids.  (Tr. 1000:2–15.)

27.   QC has historically operated as a non-union company.  (Tr. 39:4–7, 824:18–23.)

28.   Alisa Maciej and Tim Maciej did not want QC to be a union company because QC has non-union work.  (Tr. 638:18–20, 825:2–4.)

29.   Since 2000, QC has operated out of a facility in Ham Lake, Minnesota (Tr. 37:23–25, 38:4–6; P-26.)

30.   The facility includes an office space and a warehouse—referred to as the "shop"—where it stores and maintains materials, equipment, and vehicles, and served as

an employee meeting and staging space. (*E.g.*, Tr. 75:13–15, 149:6–21, 873:7–10, 874:3–7, 875:9–12.)

31. QC has its own telephone number and a website that promotes its services. (Tr. 45:11–15; P-25 at Plt_000427–31.)

32. QC employees communicate with third parties using email addresses with a QC domain (qccomp.com) and QC signature block. (*E.g.*, P-55; P-189A; P-165 at D016586; P-293; P-296.)

33. Between 2008 and 2013, QC performed floor-coating work on large jobs that required union labor (e.g., the Minnesota Twins Target Field stadium in Minneapolis, the Duluth Police Headquarters building, and Roosevelt High School in Minneapolis).[3] On these occasions, QC subcontracted its labor through a union contractor (although Tim Maciej, through QC, directed the subcontracted employees' work and use of QC's equipment) and signed a PLA that allowed QC to perform the union work; the Local 633 approved of these arrangements and QC made fringe-benefit contributions on behalf of its employees performing the union work on the project. (Tr. 39:8–14, 39:20–40:23; 491:23–503:3; 826:5–830:5, 912:20–22, 913:6–20; D-85 at CLEANING_684828.) For these PLA jobs, QC ran its employees' payroll for the union work through a third-party entity. (Tr. 297:4–13, 495:8–496:9, 826:4–17; D-101 at CLEANING_684830–31.)

34. Alisa Maciej was aware that QC employees who performed work on PLA

---

[3] Alisa Maciej testified that QC was sought out for at least some of these jobs because QC could provide an extended warranty that other floor-coating service providers could not. (Tr. 491:23–493:12, 497:20–499:12.)

projects were to be paid a union rate of pay, which was higher than QC's rate of pay, and that QC would owe fringe-benefit contributions for all of the union work performed by its employees.  (Tr. 501:4–9.)

### C.    Formation of Coatings and Entry Into Local 633 CBA

35.     At some point in June 2013, representatives of the Local 633 asked QC about becoming a signatory to the Local 633 CBA, which would enable QC to bid and work on more union projects.  (D-85 at CLEANING_684826; Tr. 504:18–24, *see also* Tr. 504–08.)

36.     During a lunch in 2013, Alisa Maciej and Tim Maciej met with Local 633 representatives—including Gullickson and Massey, and the union representatives suggested that QC should form a separate union company to get more union work.  (Tr. 507:21–508:10, 864:18–867:5.)  Massey testified[4] that, at that same lunch, the group discussed, among other things, that the Maciejs could start a floor-coating company that was separate from their cleaning company, and that the floor-coating company would perform union floor-coating work.  (Tr. 893:3–896:8.)

37.     In June 2013, after contacting and consulting with an attorney, Alisa Maciej formed Coatings; the company is wholly owned by Alisa Maciej.  (Tr. 38:18–20; 491:13–22, 508:16–509:1; P-23.)

38.     Alisa Maciej formed Coatings so that the Maciejs could bid on and do union work.  (Tr. 40:24–41:2.)

---

[4] The Court observed Massey to testify credibly.  He testified in a relaxed, calm, and matter-of-fact manner, answered questioned without hesitation, and sustained eye contact.

39.    Though Coatings was formed in 2013, it did not immediately begin operations.  (Tr. 491:13–18; 509:2–4.)

40.    In early 2014, QC bid on and was awarded work on a medical-facility project (Fairview Ridges) in Burnsville, Minnesota.    (Tr.  837:10–18;  P-294  at COATINGS_008778.)  After starting work on the project, QC discovered that the general contractor was a signatory to the Local 633 CBA and, therefore, the project required union labor.  (P-293; P-294.)

41.    The Local 633 also became aware that QC was providing non-union labor for its work on the project.  (Tr. 725:20–726:1; *see also id.* at 721:18–722:21, 723:16–724:6.)  When a payment dispute arose between QC and the Fairview Ridges project general contractor, Tim Maciej accused the Local 633 of "completely fabricat[ing]" documentation generated by the Local 633 about QC's employees' hours and rates of pay "for  their  benefit."    (P-294  at  COATINGS_008779;  *see  also*  P-293  at CLEANING_0003661.)

42.    After the Fairview Ridges project, the Local 633 continued to meet with the Maciejs and QC.  For example, Massey and another union representative met with Tim Maciej at QC's office.  (Tr. 900:2–901:16.)  Then, in June 2014, at Massey's invitation, Massey and Gullickson met with Tim and Alisa Maciej at a restaurant in June 2014 to discuss how Coatings could enter into the Local 633 CBA and perform floor-coating work on union projects.  (Tr. 727:2–728:3, 901:17–904:5.)

43.    On or around June 30, 2014, Alisa Maciej and Massey executed the Independent Addendum to the Metro Builders 9A Agreement (Independent Addendum)

(P-12), by which Coatings agreed to be bound to the terms of the Local 633 CBA through April 30, 2016.  (Pretrial Stip. ¶ 12; P-12 ("The Employer and the Union agree to comply fully with all of the provisions as set forth in the said [Local 633 CBA] Agreement as if the same were fully set out herein.").)  Alisa Maciej executed two additional Independent Addenda with Local 633 on behalf of Coatings on June 21, 2016 and July 15, 2019; as a result, Coatings remained bound to the CBA through April 30, 2022.  (*Id.* ¶ 13; P-12; P-21; Tr. 42:7–14, 43:14–18.)

44.    Pursuant to Article 3 of the Local 633 CBA, "[t]he Employees covered by this agreement shall include all Cement Masons, both journeymen and apprentices, employed by the Employer."  (Pretrial Stip. ¶ 14.)

45.    Pursuant to Article 22(h) of the Local 633 CBA, "[t]he parties to this Agreement acknowledge that the provisions of this Agreement establishing rates of pay, wages, all hours of employment and other terms and conditions of employment, including fringe benefits, apply to Employees employed in job classifications within the jurisdiction of the Union, regardless of whether or not such Employees are members of the Union."  (Pretrial Stip. ¶ 15; *see also* P-13 at Plt_000176; P-15 at Plt_000195; P-17 at Plt_000215–16).)

46.    Pursuant to Article 22 of the Local 633 CBA an "[e]mployer agrees to contribute every month, no later than the 15th of the following month . . . such sums for Pension, Health and Welfare, Savings, Apprenticeship or Training . . . as they may be established, an amount for each hour worked by all Employees covered by this Agreement."  (Pretrial Stip. ¶ 16 (quoting P-13 at Plt_000175; P-15 at Plt_000193; P-17 at

Plt_000214).)

47.     Coatings was an employer that was required to make contributions to the Funds pursuant to the Local 633 CBA during the Audit Period.  (Pretrial Stip. ¶ 17.) Employers who are required to make payments to the trust funds for which the Service Corporation is a fiduciary are considered "delinquent" under the Local 633 CBA for a particular work month if the required fringe-fund remittance report form and payment for fringe-benefit contributions owed for hours worked by employees performing covered work in a particular month are not post-marked on or before the 15th day of the following month.  (*Id.* ¶ 18.)

48.     The Local 633 CBA provides that employers that are required to pay fringe-benefit contributions "shall promptly furnish to the trustees or their authorized agents, on demand, all necessary employment and payroll records relating to its employees covered by this Agreement, including any other relevant information that may be required in connection with the administration of the" Funds.  (*Id.* ¶ 19.)

49.     The trust agreements that establish the Funds for which the Service Corporation is a fiduciary provide that the Trustees may examine "all pertinent books and records" whenever an examination is deemed necessary or advisable by the Trustees in connection with proper administration of the Funds."  (*Id.* ¶ 20.)  The right to audit an employer's business and payroll records is further defined in the Service Corporation's Policies and Procedures for Collection of Employer Contributions).  (*Id.* ¶ 21.)

50.     Pursuant to the Local 633 CBA, the trust agreements, and the Service Corporation's Collection Policy, employers are liable for liquidated damages (10%) on

delinquent and unpaid fringe-benefit contributions, and interest will be assessed on delinquent contributions at the rate of eight percent (8%) per annum compounded daily. (*Id.* ¶ 22.)

51.     Under Article 16 of the Local 633 CBA, employers are prohibited from subcontracting or subletting out covered work and agree that they "will submit or contract out such work only to a subcontractor who has signed or is otherwise bound to a written labor agreement entered into" with Local 633.  (*Id.* ¶ 23.)

52.     Additionally, the Independent Addendum provided that "[t]his Agreement is binding personally and individually upon the following: The union [the Local 633], the undersigned Employer, and each of the individual owners, partners, and stockholders of the Employer."  (P-12; *see also* P-14; P-16; Tr. 41:9–42:8.)  Alisa Maciej signed as the "Employer" with the understanding that she was binding Coatings and herself personally to the Local 633 CBA's terms.  (P-12; Tr. 41:24–42:25; Pretrial Stip. ¶ 17 ("Defendant Quality Coatings was an employer required to make contributions to the Funds pursuant to the Local 633 CBA during the Audit Period.").)

53.     Current Local 633 Business Manager Chad Morris testified that the Local 633 CBA does not prohibit double-breasting (i.e., the practice of simultaneously owning or operating a union and a non-union company).  (Tr. 1115:1–6.)

54.     Alisa Maciej understood that, by executing the Local 633 CBA on behalf of Coatings, her company was required to pay the wage rates and fringe-benefit contributions due under the Local 633 CBA.  (Tr. 43:1–6.)

### D.    Coatings's Dependence and Reliance on QC

55.    At all times, Alisa Maciej was the owner and Chief Operating Officer of Coatings.  (Tr. 38:7–9, 13–15.)

56.    Alisa Maciej did not draw a salary from Coatings.  (Tr. 546:16–17.)

57.    Alisa and Tim Maciej formed Coatings with the intention that the company would perform the same type of floor-coating work in the construction industry that QC had been performing, but for jobs that required union labor.  (Tr. 41:3–8.)

58.    Consistent with this intent, Alisa Maciej represented to third parties that Coatings "handles" the jobs that "come along that need special wage rates."  (P-55 at CLEANING_009271.)

59.    Coatings operated from mid-2014 until its cancellation of the Local 633 CBA on April 30, 2022.  (Tr. 38:10–12; Pretrial Stip. ¶ 24.)

60.    Coatings was not operated pursuant to any written business plan at any point. (Tr. 44:24–45:2.)

61.    Coatings relied on QC to cover its operational expenses and equipment needs.

    i.    Upon the formation of Coatings, Alisa Maciej deposited $1,000 in a bank account; Alisa Maciej testified that Coatings did not have the assets on its own to purchase the vehicles and materials required to perform its work.  (Tr. 46:17–25; *see also* Tr. 48:8–15.)  Coatings never acquired its own equipment in its six years of operation.  (Tr. 662:17–22, 663:12–17.)

    ii.    Because Coatings did not have its own assets required to perform its

13

work on union jobs, and because it relied on QC to lend its assets for that purpose, QC (via Alisa Maciej) sent invoices at irregular intervals to Coatings (where the invoices were received by Alisa Maciej) for Coatings's operational and materials expenses. (Tr. 47:11–15, 49:12–50:14, 206:2–7; *see also, e.g.*, D-57; D-63.) These invoices were not sent to Coatings contemporaneously with its use of QC's equipment and did not include sales tax. (Tr. 205:20–206:7; *see also, e.g.*, Tr. 210:6–211:1, 213:9–215:5, 215:22–217:19; D-57 at CLEANING_677024, CLEANING_677026, CLEANING_677035.)

iii.    QC's profit and loss reports show that Coatings's operations were a cost incurred by QC. (*See* Tr. 208:21–209:12; D-52 at COATINGS_010064–72.)

iv.    Even after being operational for years, Coatings continued to use QC's vehicles and equipment and did not acquire vehicles or equipment of its own. (Tr. 47:3–7, 783:13–784:8.)

v.    Tim Maciej testified that there was a written lease between Coatings and QC for Coatings's use of QC's equipment, but he did not know where the lease is, who negotiated it, or anything about its terms.[5] (Tr. 784:10–785:24.)

vi.    QC also loaned funds to Coatings so that Coatings could meet its payroll obligations. (Tr. 247:1–13, 248:4–249:4.) These loaned funds were not memorialized with promissory notes or other written instruments. (Tr. 249:13–23.) QC

---

[5] On the whole, the Court has doubts about Tim Maciej's credibility. While testifying at trial, Tim Maciej gave evasive and defensive answers, asked for many questions to be repeated, and denied knowledge of many fundamental aspects of the business in which has a 50% ownership interest and about his own personal finances.

14

charged Coatings no interest on these loans.  (Tr. 251:4–13.)

   vii. During the Audit Period, Coatings transferred $5.6 million to QC for its operational and equipment expenses.[6]  (Tr. 244:10–21; P-219.)

   viii. When Coatings had a bad financial year, it impacted Alisa and Tim Maciej's own personal finances.  (Tr. 545:16–547:13.)

  62. Alisa Maciej deposited at least some customer payments from Coatings projects directly into QC's bank account.  (Tr. 267:4–268:25; P-238 at 3, 4, 8 (showing deposits from Mortenson (Rochon), Monticello Middle School, Knutson Construction (Marshfield)).)

  63. Coatings did not have an independent public-facing identity that was separate and distinct from QC's, which led to third-party confusion about which company they were dealing with.

   i. Coatings had no website or dedicated social media page.  (Tr. 45:3–5, 45:25–46:2.)

   ii. Coatings's telephone number was Alisa Maciej's cell phone number.  (Tr. 45:17–24.)

   iii. A former floor-coating employee credibly testified that the only company apparel available to employees working at either QC jobs or Coatings jobs bore

---

[6] There are also discrepancies between checks issued and received between QC and Coatings; that is, one entity's books may show a transfer but the other's books do not show receipt.  (*See, e.g.*, P-28 at 12–13; P-219 (entries around July 5–6, 2018); *see also* P-219 (March 2, 2017); P-357 at PREM_CLEANING0017).)

the name "QC Companies." (Tr. 294:11–24.)

iv. A former floor-coating who worked on both QC and Coatings jobs credibly testified that other trades and individuals at union jobsites were often confused whether the Coatings crews were union or nonunion workers. (Tr. 283:9–284:14, 284:23–285:10.)

v. QC's insurance agent appeared not to understand the distinction between QC and Coatings and issued a certificate of insurance in the wrong name. (P-199.)

vi. In 2017, Alisa Maciej submitted an application for insurance for a Coatings project; on it, she indicated the application was submitted by "QC Companies/Quality Coatings, LLC." (P-272; Tr. 392:8–393:7.)

vii. In March 2018, Alisa Maciej had to instruct a union contractor to re-issue an executed contract to Coatings instead of QC. (Tr. 189:12–190:9; P-189A; *see also* P-46.)

64. Coatings did not have an independent internal identity.

i. Coatings never created or issued its own employee handbook or policy manual; it borrowed from materials created by and for QC. (Tr. 46:6–11; *see also* Tr. 51:10–52:3 (citing P-211, P-209).)

ii. A former supervisory floor-coating employee testified that, at times, he needed to use a company credit card to purchase materials for jobs to which his crew was assigned; he used the same card when purchasing items for QC's jobs as he did for Coatings's jobs. (Tr. 293:15–294:10.)

iii. There were no confidentiality agreements between QC and Coatings.

16

(Tr. 70:2–6, 400:5–8.)

65.    Between 2014 and 2022 (i.e., the duration of Coatings's operation), Coatings spent a total of $1,328.03 on office supplies.  (Tr. 238:20–239:11; P-29.)  During the years 2017–2020, Coatings spent $0.00 on office supplies.  (Tr. 239:3–5.)

66.    Coatings did not have its own employees; the individuals who performed work for Coatings all were QC employees.  (Tr. 67:24–68:9, 511:15–512:1, 835:14–836:20.)

    i.    Tim Maciej testified that, when Coatings was formed, the intention was always to use QC's floor-coating employees to perform Coatings's union work.  (Tr. 836:16–20.)

    ii.    Similarly, Gary Maciej testified that, upon learning that Alisa Maciej would form Coatings, Alisa Maciej had informed him that her new company would use QC's floor-coating employees to perform its union work.  (Tr. 1085:24–1086:12.)

    iii.    QC and Coatings did not enter into an employee-leasing agreement at any point.  (Tr. 1086:16–18.)

67.    QC's and Coatings's bidding process and sales operations overlapped.

    i.    Gary Maciej and his son, Joe Maciej, performed sales duties (i.e., bidding on projects) for both QC and Coatings.  (Tr. 786:19–787:4, 1000:2–15, 1046:22–1047:3.)  Neither were employed or paid by Coatings for such work.  (Tr. 1001:6–16, 1047:19–1048:3.)

    ii.    Joe Maciej corresponded with third parties about Coatings projects using a QC email address and a QC signature block.  (Tr. 191:8–11, 787:5–14; P-189A.)

17

iii.   QC created a bid log to track the projects on which Gary Maciej and Joe Maciej had placed bids.  (Tr. 1004:9–1005:16; P-34.)  The log was entitled "QC COMPANIES Bid Log," and bids for both QC projects and Coatings projects were tracked without distinguishing which company bid on which jobs.  (*See* P-34.)

iv.   On at least one occasion in 2018, Gary Maciej bid on a project for a known union contractor using QC's non-union rates.  (P-296.)  The contractor realized after awarding the project to QC that QC's bid was based on non-union labor rates.  (*Id.*)  The contractor expressed to Gary Maciej (who used a QC email address with the qccomp.com domain) that "we had a discussion about this before that we should be utilizing union labor on [our] projects."  (*Id.* at CLEANING_018164.)  The contractor ultimately permitted QC to supply non-union labor because the project could not "support an added cost . . . to make the switch now" to union labor.  (*Id.*)

68.   Employees that performed floor-coating work for Coatings projects performed the same work as they did for QC's floor-coating projects.  (E.g., Tr. 272:25–275:6.)

69.   QC employees directed the daily work of QC employees who worked on both QC projects and Coatings projects.

i.   Tim Maciej directed QC's and Coatings's employees on a daily basis, including deciding and then communicating to QC employees whether they would be working on a QC project or a Coatings project.[7]  (Tr. 72:2–11, 274:18–23, 783:4–6,

---

[7] At some point, Alex Maciej performed these same duties.  (Tr. 72:11–13.)

18

786:10–12.)

ii.    Tim Maciej also made decisions regarding which pieces of QC equipment would be assigned to the teams working on QC projects and Coatings projects. (Tr. 783:24–784:7.)

iii.    Tim Maciej was never an employee of and was never paid by Coatings.  (Tr. 72:16–22, 786:3–5.)

iv.    Tim Maciej did not have a Coatings company email address; instead, he corresponded with third parties about Coatings projects using his QC email address (including using his QC signature block).  (Tr. 788:17–25.)

v.    Tim Maciej testified that he had authority to hire and fire QC employees and employees working on Coatings projects.  (Tr. 783:7–12.)

vi.    All floor-coating employees (including those who would be assigned to work on Coatings's projects) reported for work at QC's headquarters in the mornings (unless working on projects located outside of the Twin Cities metropolitan area) to learn where they would work for the day, including whether they had been assigned to a Coatings or a QC project.  (Tr. 275:12–24, 276:5–17, 316:9–19; *see also* P-32; P-33.)  Tim Maciej communicated project assignments for floor-coating employees by using a whiteboard that was inside QC's shop.  (Tr. 275:25–276:7.)

vii.    After receiving their daily work assignment but before leaving the shop to travel to their assigned project sites, crews would spend approximately one hour in the QC shop gathering materials needed for their assigned jobs, loading their vehicles, and discussing objectives for the day.  (Tr. 276:14–25, 281:8–282:22.)

19

70.    QC employees who performed work for Coatings had two different rates of pay: (1) a QC hourly rate, and (2) a union hourly rate, which was significantly higher than the QC hourly rate.  For example:

i.    From January to May 2022, QC employee P.P.'s QC rate of pay was $19.00 per hour and his union rate of pay was $41.51 per hour.  (*See* P-83A at CLEANING_002715–16; P-82 at COATINGS_697–98.)

ii.    In May 2021, QC employee M.T.T.'s QC rate of pay was $18.00 per hour and his union rate of pay was $41.51 per hour.  (Tr. 113:11–24; P-81 at 5022; P-83 at 801–802.)

iii.    From January to May 2021, QC employee N.L.'s QC rate of pay was $15.50 per hour and his union rate of pay was $40.76 per hour.  (Tr. 99:19–101:2; P-83B at CLEANING_001347–48; P-81 at COATINGS_004988–91.)

71.    QC and Coatings had the same vendors and customers.  (Tr. 58:10–59:24, 196:17–199:25; P-37; P-38; P-39; P-40; P-40A; P-41.)

i.    Except for the year 2020, Coatings "didn't pay directly" for insurance; rather, Coatings's insurance "would be under the QC Companies operational expenses." (Tr. 238:5–15; P-29.)

ii.    Coatings did not have its own workers' compensation insurance policy; employees who may be injured while working on a Coatings project would have had to make a claim under QC's workers' compensation insurance policy.  (Tr. 356:10–25; *see also* P-279 at CLEANING_008010.)

72.    QC's and Coatings's in-house operations occurred in the same physical

20

space.  QC's shop did not have separated or otherwise distinct areas where it stored QC's equipment apart from Coatings's equipment (if any) or where QC employees performed shop work apart from employees assigned to work on Coatings projects.  (Tr. 282:9–15.)

73.    QC's and Coatings's payroll practices were intermingled.

74.    Alisa Maciej represented to an insurer that Coatings did not have any payroll of its own and instead ran its payroll through QC.  (P-279 at CLEANING_008010.)

75.    Alisa Maciej performed payroll duties for both Coatings and for QC.  (Tr. 36:4–10, 36:17–19, 69:9–11, 70:7–11.)  Alisa Maciej understood that employees who performed union work were entitled to union wage rates and corresponding fringe-benefit contributions that Coatings was required to make under the Local 633 CBA.  (Tr. 43:1–6.)

76.    Employees who performed work for Coatings picked up their paystubs at QC's office.  (Tr. 286:21–23.)

77.    QC and Coatings used the same time-card system to track employee time.  (Tr. 74:17–20, 80:16–23; P-89; *see also, e.g.*, P-78D.)  Employees reported to the QC headquarters in the morning, where they would punch in via a timekeeping app that could be accessed on an iPad or a mobile phone; while punching in, employees would indicate to which job they were assigned and/or whether they were assigned "shop time."[8]  (Tr.

---

[8] Prior to implementing an electronic timekeeping app in January 2016, employees of both QC and Coatings were also required to complete semi-monthly calendar forms with "QC Companies" headings, on which they would record on which project they worked and for how many hours, even for Coatings projects.  (Tr. 83:24–85:13, 290:3–10; *see also, e.g.*, P-147 at 1.)  Even after the electronic timekeeping app was implemented, some employees opted to continue using the paper calendar timekeeping forms.  (Tr. 85:9–19.)

75:9–19 76:18–77:2, 143:3–5.)  At the end of the workday, the employee punched out using the same system.  (Tr. 77:3–5.)

78.    The app did not provide an option by which an employee could select for which company—QC or Coatings—they were working when they punched in and out.  (Tr. 291:3–8.)

79.    The timekeeping app created timecard reports, which Alisa Maciej used to create the payroll records for each QC and Coatings.  (Tr. 81:11–14.)  The timecard reports did not specify by which company an employee should be paid.  (Tr. 80:5–23.)  The timecard reports also displayed whether hours were regular hours or overtime (OT) hours.  (*See, e.g.*, P-78D.)

80.    Alisa Maciej used the timecard reports to create payroll records for both QC and Coatings.  (Tr. 81:11–14.)  At times, Alisa Maciej cross-referenced other sources (such as employee and supervisor job sheets) to discern which hours of logged time she believed were "covered" by the Local 633 CBA and therefore were to be paid through Coatings (at union rates and with corresponding liability for union wages and benefits).  (Tr. 86:1–19, 94:22–95:3; *see also, e.g.*, P-84; P-117 at 7.)  Alisa Maciej then manually determined, using a sheet entitled, "Quality Coatings Work Week," which hours were "covered hours" and then entered hours to be paid through Coatings into Quickbooks.  (Tr. 87:17–98:17, 105:12–24; P-73; P-84; P-117.)  While making this manual determination, Alisa Maciej often made notations that certain hours employees had spent on Coatings projects were not to be paid through Coatings.  (*See, e.g.*, P-84; P-125 at D00338; P-118 at D003415; P-119 at D003407; P-120 at D003400; P-121 at D003391; P-122 at D003385; P-123 D003344;

22

P-124 at D003350; P-125 at D003338; P-126 at D000333; P-127 at D003326; P-133 at D003757; Tr. 87:13–88:2.)

81.     Any hours not recorded in Coatings's Quickbooks would be paid through QC. (Tr. 87:17–98:17, 105:12–24; P-73; P-84; P-117.) Alisa Maciej was aware that hours not entered into Coatings's Quickbooks would be paid through QC. (Tr. 88:1–7.)

82.     Referring to the hours Alisa Maciej alone had allocated for payment through Coatings, she thereafter generated a fringe-benefit fund remittance report on a monthly basis, which she would send to the Service Corporation for the purpose of reporting and paying fringe-benefit contributions under the Local 633 CBA. (Tr. 94:2–95:21; *see also* P-73.)

83.     Alisa Maciej told Gary Maciej upon formation of Coatings that she would pay QC employees performing work on Coatings projects any OT hours through QC at the QC rate of pay. (Tr. 1087:2–8.)

84.     Alisa Maciej believed that time spent by employees on Coatings jobs traveling to and from the jobsite and time spent performing shop work (e.g., loading equipment and preparing vehicles to be used at union projects) was not "covered work" under the Local 633 CBA.[9] (Tr. 417:2–421:24, 641:6–16, 643:10–14, 660:17–24, 663:23–667:12.) Alisa Maciej also testified that, generally, she was not aware of the nature of the tasks employees performed while in the shop—i.e., whether the work they performed

---

[9] The Court observed that Alisa Maciej's testimony regarding her beliefs about what work was "covered work" under the Local 633 CBA was guarded, if not at times evasive.

related to a union or non-union project. (Tr. 475:15–21.) Alisa Maciej further testified that she was unaware of the exact times employees started and stopped performing work she believed to be "covered" and "not covered" work. (Tr. 657:12–659:21.) Alisa Maciej also conceded that employees performing work on Coatings projects needed to load trucks to get ready for their daily work; however, because they performed these tasks at QC's shop, their time was paid through QC. (Tr. 660:17–24.)

85.    Alisa Maciej responded, "I don't know," when asked how she formed a belief about what work was "covered work" and what was not. (Tr. 667:6–12.)

86.    Floor-coating employees who spent more than forty hours in a single week doing work for Coatings jobs had their OT hours paid by QC at QC's significantly lower, non-union hourly rate. (Tr. 281:6–7, 282:16–24, 285:23–25.) A former floor-coating employee, Aaron Yonak,[10] who worked for QC from August 2010 until October 2019, and for Coatings from the time it became operational until October 2019, testified he frequently worked OT hours, and that "[a]nything after 40 hours" would be "QC overtime," even when the work related to Coatings projects. (Tr. 281:3–7, 282:16–242, 285:23–25.) Yonak testified that employees were not told and did not question why they were not paid OT through Coatings because "we felt fortunate to be getting union wages for even the 8 hours

---

[10] The Court found Yonak's testimony and demeanor to be credible. He provided clear, plain-spoken answers, did not hesitate or pause during his answers to questions, demonstrated strong and detailed recall of events, maintained eye contact, appeared confident and displayed no indication of anxiety or nervousness. Further, he testified that he was not paid for his participation at trial. (Tr. 314:8–9.)

that we were there."[11] (Tr. 282:25–283:8.)

87.     Alisa Maciej's practice of allocating and then paying Coatings's employees' OT through QC at the lower QC hourly rate of pay occurred throughout the Audit Period.

i.     For example, while employed by QC (from August 2010 until October 2019) and Coatings (from the time it became operational in 2014 until October 2019), Yonak never received OT pay at this union rate of pay even though he regularly worked more than 40 hours per week on Coatings jobs. (Tr. 281:3–7, 282:16–238:8, 285:23–25.)

ii.     In addition, from the period May 1 through May 31, 2021, employee T.T.M.'s time cards show that he recorded 136.5 hours on Coatings projects. (Tr. 108:3–110:19; P-78B; P-78C.) However, on the May 2021 fringe-benefit remittance form that Alisa Maciej submitted to the Service Corporation, Coatings reported only 98 hours for T.T.M. (Tr. 110:20–111:11; P-73A at COATINGS_000106.) Alisa Maciej testified that the 38.5 hours not reported to the Service Corporation had been paid to T.T.M. through QC's payroll at QC's OT rate of pay even though T.T.M. had not worked more than 40 hours of QC straight time. (Tr. 111:12–112:4, 114:23–117:5; P-83A at CLEANING_001864–65.)

iii.     Likewise, Alisa Maciej K.K. recorded time on a Coatings project on

---

[11] Yonak contacted the Local 633 regarding Coatings's OT practices after he separated from employment with Coatings. (Tr. 298:8–16.) Yonak's report to the Local 633 resulted in the Local 633 sending Coatings a Grievance in November 2021. (Tr. 930:9–931:1; D-91.) The Grievance letter informed Coatings (which it identified as "Quality Coatings, L.L.C. a/k/a Quality Cleaning, Inc. d/b/a QC Companies of Minnesota") that it learned that Coatings was "double-breasting and operating 'non-union' under the guise of a single employer, joint employer, joint venture, and/or alter ego." (D-91.)

January 3 (9.25 hours), January 4 (10.75 hours), and January 5, 2022 (8.5 hours). (Tr. 160:7–24; P-89A at D008748.) However, on her "Quality Coatings Work Week" worksheet, Alisa Maciej recorded K.K. as working only 8 hours on January 3 and that he worked 0 Coatings hours on January 4 and 5. (Tr. 160:25–161:3; P-133at D003757; *see also* Tr. 178:19–179:5 (testifying that entirety of 2022 Coatings payroll journal shows that no OT hours were paid through Coatings); P-82.)

88.    On at least one occasion, Alisa Maciej's son, Alex Maciej, was paid for shop time at his union rate of pay. (Tr. 145:2–22; P-78D at D007965.) On another occasion, another of Alisa Maciej's sons, Zach Maciej, was paid for shop time at his union rate of pay. (Tr. 668:19–669:5; P-78E at D007301.)

89.    As a result of these practices, Coatings's payroll records will not reflect all hours worked on Coatings projects during the Audit period. QC's records will reflect such hours.

90.    The Service Corporation did not receive contributions for any hours employees were paid through QC. (Tr. 102:3–8; *see also* Tr. 112:1–4, 159:4–16. *Cf.* Tr. 94:9–21.)

91.    Payroll auditor Greg Benson, who audited Coatings's payroll records that it produced during this litigation, testified that he observed disparities in the number of hours employees working on Coatings projects reported on their timecards and the number of hours paid through Coatings's payroll. (Tr. 972:4–973:12.)

92.    Alisa Maciej completed the fringe-benefit remittance forms on a monthly basis, which were sent to the Service Corporation. (Tr. 94:2–5; *see also* P-73.)

26

93.    The fringe-benefit remittance forms were meant to report hours to the Service Corporation for which fringe-benefit contributions were due under the Local 633 CBA. (Tr. 94:9–13.)

94.    Alisa Maciej referred only to Coatings's Quickbooks system when preparing the fringe-benefit remittance forms. (Tr. 94:17–95:9.) That is, she reported to the Service Corporation only the hours she had determined should be paid through Coatings.

95.    Based on the testimony of Yonak, the Court finds that at some point, a co-worker called the Local 633 to report that QC employees working on Coatings projects were not being paid as they should. (Tr. 295:4–11.) Upon learning that an employee had contacted the Local 633, Tim Maciej stated that he would fire whoever had made the report. (Tr. 295:12–20.)

96.    In addition, based on Yonak's testimony, the Court finds that, while on a Coatings job in North Dakota, a non-cardholder QC employee was directed by a supervisor on a Coatings project to hide from a union representative who was visiting the jobsite. (Tr. 295:21–296:6.)

**E.    Termination of Local 633 CBA and Subsequent Litigation**

97.    In late January 2022, the Service Corporation, through counsel, informed Coatings that it had reason to believe that Coatings and QC had failed to report union hours to the Service Corporation, advised that it would be conducting an audit for a period beginning June 1, 2016. (P-19.)

98.    On February 16, 2022, Coatings provided the Local 633 notice that it was terminating the Local 633 CBA effective April 30, 2022. (P-21.)

27

99.    On March 18, 2022, the Service Corporation filed this action.  (Doc. No. 1.)

### DISCUSSION

The Service Corporation brings its claims under ERISA (specifically 29 U.S.C. § 1132(a) and 29 U.S.C. § 1145), seeking a complete payroll- and employment-record audit of the Defendant entities, including both Coatings and QC.

Under ERISA, "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall . . . make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145.  ERISA's civil-enforcement provision, 29 U.S.C. § 1132(a), "create[s] a cause of action by which appropriate plaintiffs may enforce an employer's obligations to make contributions to employee benefit plans." *Romney v. Lin*, 94 F.3d 74, 82 (2d Cir. 1996); *see also Trs. of the So Cal IBEW-NECA Pension Plan v. Fadul*, No. SACV 18-00605NS (DFMx), 2022 WL 2288022, at *5 (C.D. Cal. Mar. 9, 2022).  ERISA expressly permits equitable relief to redress any act or practice that violates ERISA or the terms of a plan.  29 U.S.C. §§ 1132(a)(3), (g)(2)(E).  Audits are appropriate "in an ERISA case where the amount of [a] delinquency is not known." *Painters Dist. Council No. 2 v. Com. Drywall Constr., LLC*, No. 4:11-CV-1430 (CAS), 2012 WL 996663, at *4 (E.D. Mo. Mar. 23, 2012).

For the reasons set forth below, the Court concludes that the Service Corporation is entitled to judgment in its favor on Counts I and II (together asserting the right to audit Defendants as a single employer based on an alter-ego theory), and III (asserting that Alisa Maciej is personal liable for any fringe-benefit contributions that are later determined to be

due and owing by the Defendant entities) of the Amended Complaint.[12]

## I.    COUNTS I AND II – ALTER EGO AND RIGHT TO AUDIT QC

Generally, like any contract, only parties to a CBA are bound by its terms. *Johnson v. Charps Welding & Fabricating, Inc.*, 950 F.3d 510, 520 (8th Cir. 2020) (hereinafter, "*Johnson II*"). Under ERISA, CBA-signatory employers who are delinquent on fringe-benefit reporting or contributions are required to permit the examination of their records when deemed necessary by a trustee or fiduciary such as the Service Corporation, and a fiduciary of a plan (i.e., the Service Corporation) may collect unpaid contributions from a non-signatory (i.e., QC) upon a showing that the non-signatory entity and the signatory entity are alter egos. *Id.*

The parties do not dispute that Coatings signed and was covered by the Local 633 CBA during the Audit Period and that QC did not.  The parties also do not dispute that, under the Local 633 CBA, all signatories are required to make fringe-benefit contributions for hours worked on projects covered by the Local 633 CBA.  Further, there is no dispute that the Service Corporation is the receiving agent and fiduciary for the Funds that is authorized to enforce the Funds' rights and obligations, including the right to pursue legal action for the collection and enforcement of any employer's reporting and payment obligations under any applicable CBAs.

The Service Corporation bears the burden of proving[13] that Defendants were alter

---

[12] Count IV will be resolved at a later date after an audit is completed.

[13] The Court takes note that ERISA does not establish whether a clear and convincing evidence standard or preponderance of the evidence standard applies.  Courts appear to

29

egos of each other during the Audit Period—that is, that QC and Coatings acted as a single employer such that QC, too, is liable for unpaid fringe benefits. *See Marshall v. Anderson Excavating & Wrecking Co.*, 901 F.3d 936, 943 (8th Cir. 2018). To determine whether entities are alter egos, the Eighth Circuit applies "corporate law principles to determine employer liability under ERISA, where such principles comport with the language and purposes of the statute." *Greater Kan. City Laborers Pension Fund v. Superior Gen. Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997). Under this doctrine, "the legal fiction of the separate corporate entity may be rejected in the case of a corporation that (1) is controlled by another to the extent that it has independent existence in form only and (2) is used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud." *Id.*; *see also Johnson II*, 950 F.3d at 520.

## A.   QC's Control of Coatings

Courts consider several common-sense factors to determine whether one organization is an alter ego of the other, such as whether the entities share a business purpose, whether they share management and control, whether funds have been commingled, whether the entities share employees, and whether the entities transact with

---

assume that a preponderance of the evidence standard applies, and this Court need not determine whether the more stringent clear-and-convincing standard applies because the evidence presented is sufficient to satisfy either standard. *See Johnson v. Charps Welding & Fabricating, Inc.*, No. 14-CV-2081 (RHK/LIB), 2017 WL 4402388, at *1 n.10 (D. Minn. Oct. 2, 2017) (hereinafter, "*Johnson I*") (noting applicable burden of proof in an ERISA action involving allegations of alter ego is a preponderance of the evidence); *Trs. of Mosaic & Terrazzo Welfare, Pension, Annuity & Vacation Funds v. High Performance Floors, Inc.*, 233 F. Supp. 3d 329, 335–36 (E.D.N.Y. Feb. 9, 2017) (same).

30

each other at arm's length. *See Superior Gen. Contractors, Inc.*, 104 F.3d at 1055–56; *Shopman's Loc. Union 502 Pension Fund v. Samuel Grossi & Sons, Inc.*, 578 F. Supp. 3d 698, 707–10 (E.D. Pa. Jan. 6, 2022); *Trs. of the Loc. 7 Tile Indus. Welfare Fund v. Sesso Tile & Stone Contractors, Inc.*, No. 15 CV 6124 (SJ) (RML), 2016 WL 4597481, at *2–3 (E.D.N.Y. Aug. 18, 2016); *Operating Eng'rs Loc. No. 101 Pension Fund v. K.C. Excavating & Grading, Inc.*, No. 01- 0087-CV-W-SOW, 2002 WL 1492103, at *5–7 (W.D. Mo. Mar. 11, 2002).

In this case, the Service Corporation proved by sufficient evidence that during the Audit Period, Coatings had no independent identity, either to the public or internally; instead, Coatings "[wa]s controlled by another to the extent that it ha[d] independent existence in form only."[14] *Superior Gen. Contractors, Inc.*, 104 F.3d at 1055.

For instance, QC and Coatings had the same individuals in positions of management, ownership, and supervision. Specifically, Alisa Maciej performed payroll and bookkeeping duties for both entities; Gary Maciej and Joe Maciej performed sales and bidding work for both entities; and Tim Maciej directed the daily work and personnel management of both QC and Coatings' floor-finishing employees. Alisa Maciej owned

---

[14] Defendants argued at trial and in their post-trial briefing that the Local 633 CBA does not expressly forbid double-breasting and that union members such as Massey and Gullickson encouraged the Maciejs to launch a double-breasted operation. (Doc. 206 at 18; Tr. 507:21–508:10, 864:18–867:5.) However, the inquiry here is not whether double-breasting is permissible. Rather, the Court is asked to determine whether the Service Corporation is entitled to an audit based on a theory that, due to the unique operational characteristics of QC and Coatings, Coatings was an *alter ego* of QC (not whether Defendants were double-breasting).

31

Coatings, while her husband (Tim Maciej) and his brother (Gary Maciej) owned QC. Tim Maciej—a QC employee only—assigned which QC employees would work on Coatings projects and directed what QC equipment those employees would use. Gary Maciej and Joe Maciej—who were both QC employees only—performed sales duties for Coatings using the same procedures and practices as they did when performing sales duties for QC. Neither Alisa Maciej, Gary Maciej, nor Tim Maciej were paid by Coatings for the work they rendered for it.

In addition, QC and Coatings engaged in the same kind of floor-finishing work and used the same employees to perform this work. Coatings relied entirely on payroll loans from QC to cover its payroll, and Coatings had no employees of its own; all of its work was performed by QC employees. QC's and Coatings's timekeeping was tracked through the same app, which made no distinction between QC and Coatings and which did not allow an employee to specify for which company they were working when punching in and out.

Further, QC and Coatings used the same equipment and vehicles to perform their floor-coating work. In fact, Coatings had no assets of its own would have been unable to perform its work if not for its use of QC's equipment and vehicles. Coatings's workers drove vehicles and wore apparel bearing QC's logo. QC and Coatings also used the same physical shop space for their equipment and personnel needs and both QC and Coatings used many of the same third-party vendors (e.g., insurers, bookkeeping software,

32

timekeeping app, payroll service).[15]

Finally, Coatings also had no business plan or any of its own policies, handbooks, apparel, or forms.  Instead, Coatings relied on materials generated by QC.  Moreover, despite Coatings's reliance on QC for employees and payroll loans, QC and Coatings did not have any confidentiality agreements in place regarding the sharing of information regarding employee wages.

Therefore, based on this evidence, the Court concludes that Coatings (which indisputably lacked everything from assets necessary to perform its floor-coating services to payroll to personnel to email addresses) existed in form only.  *See, e.g.*, *Trs. of Mosaic & Terrazo*, 233 F. Supp. 3d 329 (concluding two entities were alter egos in ERISA action when the entities "shared management, employees, operations, and equipment, and . . . had a common business purpose," as well as centralized labor relations and close personal connections between the entities' owners).  Without QC, Coatings was not an independently viable company.  The first prong of the alter-ego analysis is satisfied.

---

[15] The Court did not find Tim Maciej credible when he testified that QC and Coatings had entered into a written lease to govern the terms of Coatings's use of QC's equipment and vehicles.  Tim Maciej (who is a 50% of QC and would presumably have knowledge regarding significant leases into which his company entered) was unable to provide any details about the terms of any such lease or when it was negotiated and by whom.  Further, Tim Maciej's testimony was not corroborated by any other witness and no written lease was put into the record.  Moreover, there were no documents evidencing loans made by QC to Coatings.  Instead, QC invoiced Coatings irregularly and not contemporaneous with Coatings's use of QC's equipment.  The invoices also did not show the application of any sales tax.

### B.    Efforts to Avoid Obligations under the Local 633 CBA

Turning to the second prong of the alter-ego analysis, courts consider whether an entity was used as a subterfuge to defeat public convenience, to justify wrong, or to perpetuate a fraud. *Superior Gen. Contractors, Inc.*, 104 F.3d at 1055; *Johnson*, 950 F.3d at 520.  "[A] critical part of the inquiry is whether an employer displays anti-union sentiment by using the alter ego to avoid its obligations."  *Johnson II*, 950 F.3d at 520 (quotation omitted).  A plaintiff meets this prong of the alter-ego inquiry not "by proving anti-union sentiment *in general*; rather, they must show Defendants display anti-union sentiment *by using the alter ego to avoid their obligations*."  *Iron Workers St. Louis Dist. Council Pension Tr. v. Samron Midwest Contracting, Inc.*, No. 4:21-CV-0223 (JAR), 2024 WL 1344808, at *8 (E.D. Mo. Mar. 29, 2024) (emphasis in original); *see also Siepel v. Arrowhead Indus. Serv., Inc.*, No. 07-CV-3864 (PJS/RLE), 2010 WL 605722, at *2–3 (D. Minn. Feb. 11, 2010) (concluding that intertwined entities were used as subterfuge to give party "the benefit of the CBA without having to pay its full costs").

Therefore, the question here is whether QC was used as a subterfuge to elude Coatings's union obligations.  In this case, the Service Corporation established by sufficient evidence that Coatings chose whether individual employees and portions of their hours in a given day was performed for Coatings or QC to avoid its union obligations under the CBA.[16]  Not only was the hourly rate of pay required by the Local 633 CBA

---

[16] Defendants asserted in their closing and post-trial briefing that the Service Corporation failed to show anti-union animus because members of the Maciej family were union members and because no member of the Maciej family outwardly expressed ill will toward unions. The Court disagrees with this argument for three reasons. First, evidence of union

significantly higher than the rate QC paid for nonunion labor, Coatings regularly avoided paying union-rate OT and corresponding fringe benefits by designating certain hours as work performed for QC instead of Coatings.[17]  During the Audit Period, Alisa Maciej had decided that OT hours worked for most Coatings projects and workers would not be paid by Coatings, but instead through QC and at the QC hourly OT rate.  In fact, Alisa Maciej reduced the number of Coatings hours based on (admittedly unfounded) assumptions about what was "covered" work and what time employees started/stopped engaging in such work. Alisa Maciej even admitted that employees working on Coatings projects needed to load their trucks to get ready for their union projects, yet because they were at QC's shop, they were QC employees just for that portion of the workday.  Alisa Maciej's practice of paying OT through QC not only resulted in a smaller paycheck to union cardholders, but it also had the effect of reducing Coatings's liability for fringe-benefit contributions to the Local

---

membership does not de facto absolve any individual from harboring anti-union animus. Second, and more importantly, the inquiry is not whether Defendants harbor anti-union sentiment, rather, it is whether Defendants abused the corporate form to the union's detriment.  *E.g.*, *Samron Midwest Contracting*, 2024 WL 1344808, at \*8.  Third, the argument conflicts with credible evidence.  Even if Defendants were correct that the inquiry requires evidence of their anti-union ideology, Yonak credibly testified that Tim Maciej threatened to fire whoever reported Coatings's payroll practices to the Local 633.

[17] While there is some general testimony that Coatings paid OT through its payroll at times (Tr. 532:12–14), the Court cannot determine whether this actually occurred in practice, when it may have occurred (and the timing of its occurrence relative to the audit period), or at what frequency, because neither party presented documentary evidence of such a practice and because this general testimony conflicts with other, more detailed evidence. (*Cf.* Tr. 178:19–179:5 (testifying that entirety of 2022 Coatings payroll journal shows that no OT hours were paid through Coatings); P-82.)  Further, though Alisa Maciej adamantly testified that pre- and post-union-job "shop time" was always paid through QC, she also admitted that, at least on two occasions, she paid her sons their union rate for shop time.

633. Sufficient evidence shows that practice occurred for the duration of the Audit Period.

Coatings's treatment of its employees' OT hours demonstrates that Coatings purposely used QC to defeat Coatings's obligations under the Local 633 CBA. If not for its deeply intertwined—and almost indistinguishable—relationship with QC, Coatings would not have been able to engage in its practice of siphoning off OT hours from the timecards of employees working on Coatings projects to both achieve reduced payroll and fringe-benefit contribution liabilities. *See, e.g.*, *See, e.g.*, *Seipel*, 2010 WL 605722, at \*2–3 (concluding in ERISA action that "joint arrangement" between non-union entity and union entity owned by the same individual—in which the non-union entity bid on non-union jobs and the union entity bid on union jobs and used the same employees for both union and non-union jobs—imbued owner with "the benefit of the CBA without having to pay its full costs").

Because the Service Corporation proved both prongs of the alter-ego analysis, the Court concludes QC and Coatings are alter egos and therefore may be considered a single employer for auditing purposes. The Service Corporation may conduct an audit of QC and Coatings to determine their liability as a single employer for unpaid fringe-benefit contributions due and owing for the Audit Period.

## II.    COUNT III – ALISA MACIEJ'S PERSONAL LIABILITY

In Count III, the Service Corporation seeks to hold Alisa Maciej individually liable for any fringe-benefit contributions that are later deemed due and owing by QC and Coatings. The Court concludes that the plain language of the applicable provision of the Local 633 CBA makes Alisa Maciej personally liable.

36

As a general legal matter, the owner or officer of an employer can be personally liable under ERISA if they have signed a contract in which they made such an agreement. *E.g.*, *Malcolm v. Guerra*, No. 06-CV-2338 (DSD/SRN), 2007 WL 4465206, at *2–3 (D. Minn. Dec. 18, 2007) (applying Minnesota contract law to determine employer's individual liability in ERISA action).  ERISA provides that an "employer" is "any person acting directly as an employer or indirectly in the interest of an employer, in relation to an employee benefit plan . . . ."  29 U.S.C. § 1002(5).

In this case, the Independent Addendum unambiguously provides that Alisa Maciej agreed that the Local 633 CBA is "binding personally and individually" upon her as the owner of the "employer" (i.e., Coatings).  As the Court concluded *supra*, because of their alter-ego relationship, Coatings and QC are to be regarded as a single "employer" during the Audit Period.  Therefore, Alisa Maciej will be personally liable for the obligations of QC and Coatings should a later audit determine that the Service Corporation is owed fringe-benefit contributions.

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  The Service Corporation is entitled to judgment in its favor on Counts I, II, and III of the Amended Complaint.

2.  The Service Corporation is entitled to the audit requested in Count II for the Audit Period.

3.  Coatings was the alter ego of QC during the Audit Period and the two entities shall be treated as a single employer for purposes of the audit.

37

4.    Alisa Maciej is personally liable for the obligations of QC and Coatings should a later audit determine that QC and Coatings owe fringe-benefit contributions to the Service Corporation during the Audit Period.

Dated:  March 26, 2026

/s/ *Jeffrey M. Bryan*
Judge Jeffrey M. Bryan
United States District Court